[No. 31202.  Department Two.  October 6, 1950.]

CHARLES B. STALLSMITH *et al., Appellants,* v. ALDERWOOD
WATER DISTRICT *et al., Respondents.*[1]

*Clarence J. Coleman* and *Thomas G. McCrea,* for appellants.

*Preston, Thorgrimson & Horowitz, C. M. Jordan, Wm. A. Johnson,* and *Vedova, Horswill & Yeomans,* for respondents.

ROBINSON, J.—This is an appeal from a decree dismissing an action in equity, instituted in the superior court of Snohomish county on April 8, 1949, to restrain the Alderwood water district, a municipal corporation, organized in 1933 under Rem. Rev. Stat., § 11579 [P.P.C. § 994-1] *et seq.,* and the commissioners thereof, from further proceeding with certain improvements in local improvement district No. 18, and to obtain a declaratory judgment to the effect that all proceedings taken by the district in establishing local improvement district No. 18 were void for want of jurisdiction. The plaintiffs were landowners in LID No. 18. A

[1]Reported in 222 P. (2d) 836.

number of other landowners in that district came into the case as intervening plaintiffs, and other landowners in the district, and parties who would suffer substantial financial loss if the restraining order was granted, came into the case in support of the defendants. Among these parties were Malaspina & Napoli Company to whom the district commissioners let the construction contract for the improvement, and Conrad, Bruce & Company, Hartley Rogers & Company, and Hughbanks, Inc., investment bankers, who, in effect, financed the improvement by agreeing with the contractor, Malaspina & Napoli Company, to purchase the warrants of Alderwood water district, LID No. 18, which might be issued to it, and did purchase such warrants in the amount of sixty thousand dollars on April 18, 1949. Having been permitted to intervene, the contractor and the financial firms who agreed to purchase the district's warrants joined in the defendants' prayer that the action be dismissed.

The cause has been brought to this court for review on a voluminous record, containing three hundred pages of oral testimony and many elaborate documentary exhibits, including a large number of maps and blueprints of the water district and its local improvement districts. Fortunately, the statement of facts includes a very comprehensive and useful decision rendered by the trial judge. In the introductory paragraphs of his memorandum decision, the trial judge made a much more definite statement of the objects and purpose of this cause than we have above made, and for that reason we quote it:

"This cause represents the effort of plaintiffs and the very numerous others who as interveners join them, to nullify by injunction the action of Alderwood Water District in declaring the establishment of Local Improvement District No. 18 of that water district and the prosecution of the works contemplated by the Resolution No. 409, Exhibit 'B', purporting to establish the improvement district and adopted July 12, 1948.

"It is thus the effort of plaintiffs and the interveners joining them to question and to undo the action of the municipal corporation, a unit of local government under which they live, or at least within the jurisdiction and limits of which

lands in their ownership are situated. Though that local government, Alderwood Water District, acts by and through its Board of Commissioners, the powers, the exercise of which are questioned, belong to the water districts and not to the commissioners."

As an approach to the legal problems presented by this appeal, we will outline the factual background of the cause.

As hereinbefore mentioned, the Alderwood water district was organized in 1933 under Rem. Rev. Stat., § 11579 *et seq.* A comprehensive scheme was adopted pursuant to the provisions of the statute, and a number of local improvement districts were established to provide for the construction of various parts of the system, and among them LID No. 2.

During the year 1946, there were many complaints from water users in that district that their water supply was inadequate, and in some instances nonexistent. In October of that year, the Alderwood water district sent out a questionnaire to each water customer in LID No. 2. Such questions were asked as the following:

"Were you out of water during the past year for reasons other than shut-off, and, if so, how many times? Was the pressure adequate?"

Eight or nine hundred of the questionnaires were answered and returned to the water district. From the information thus elicited, and from numerous investigations and surveys by the water district's engineers, it was determined that it would be at least necessary to replace a large portion of the water pipes in LID No. 2.

The need for an improvement of the system was discussed at all meetings of the water district commissioners, and quite generally at nonofficial meetings held throughout the district. As a result of investigations and surveys, it became apparent that, although the distribution system in LID No. 2 was sufficient to supply water to a restricted number of the residents in the district, those living in the areas at the extremities of the system were not receiving adequate service. The inadequacy of the system in LID No. 2, prior

to the formation of LID No. 18, the LID district sought to be enjoined, was described by several witnesses. When asked as to the extent of the inadequacy of the water supply in LID No. 2 prior to March 9, 1949, Mrs. Chapman testified as follows:

"To the extent that at peak load hours, especially all during the summer months, we won't have any water at all; and on week-ends we'd have none from early in the morning until late at night."

Mrs. Krause was asked to tell the court what her situation had been from the time she moved to her present residence up to March 9, 1949, as to the availability of water. She testified as follows:

"Well, it has been atrocious these last couple or three years. I have a small youngster, and there has been times when we have had no water from morning until night, and anybody that ever tried to send a five-year old boy to school by washing him in a tea-cup, well I might say it's quite a problem, believe me. There has been no bathroom facilities whatsoever for days on end, and no water to drink at all. When there was any water, we had to put pans full around. And now since they have managed to hook us into the new pipe, we are getting some water, . . ."

Another water user in former LID No. 2 testified that, prior to March 9, 1949, they did not have enough water to keep their hot water system functioning.

Mrs. Schultz testified that she had lived in the district for nearly four years, and that, prior to March of 1949, she got very little water. She was asked whether there had been any improvement, to which she replied:

"Well, it has been better since we've been connected up with the new pipes. Before we were connected up, if we had a little trickle outside, we didn't have any in the house."

Meetings were held and the problem considered at various places throughout the localities concerned. At these meetings, the deficiencies of the existing system in LID No. 2 were pointed out by the district engineer, and plans for correcting them explained.

The conditions testified to by the three housewives, above mentioned, were largely due to the fact that the general distribution water pipes in LID No. 2 were leaky, second-hand, reclaimed boiler tubing. It was to remedy such conditions that the commissioners of the Alderwood water district decided to create LID No. 18; for, as the trial judge stated in his memorandum decision:

"By pleadings herein and by proofs it is apparent that substantially the entire area of proposed Local Improvement District No. 18 had originally been contained in Local Improvement District No. 2, and that there was previous installation of facilities under that organization. These installations by preponderating proof had become deteriorated which, coupled with increased demand due to larger number of consumers, rendered the service inadequate and even in some instances defeated entirely at times and seasons."

In the early spring of 1947, the Alderwood commissioners, in hope of remedying the unfortunate situation in LID No. 2, instructed their engineer, Richard E. Wolff, to prepare petitions leading to the establishment of local improvement No. 18. By April 18, 1948, such a petition was signed by many owners of lands in the locality where the water service was inadequate. Shortly thereafter, the district engineer filed a certificate in the office of the Alderwood water district which read as follows:

"I hereby certify that I have checked the signatures on the petitions for the creation of Local Improvement District No. 18 and find that they have been signed by more than 51% of the owners of tracts of land in the area described in the petition.

> "R. E. Wolff [Signed]
> R. E. Wolff
> District Engineer"

Unofficial meetings were held by the Alderwood commissioners at various places within the proposed LID No. 18, at which plans for the improvement were explained and discussed. On June 17, 1948, notice of an official hearing of the petition, to be had at the Alderwood water district on July 12, 1948, was first published in the Edmonds Tribune-Review, a newspaper having an extensive circulation in the

Alderwood community. The notice was headed: "Alderwood Water District Notice," in bold black type, and the text thereof began as follows:

"NOTICE IS HEREBY GIVEN: That a petition for the creation of a Local Improvement District embracing and including all the following described real property, to-wit: [Then followed 112 lines of precise legal descriptions of the properties involved, after which the gist of the petition for the creation of the Local Improvement District in the territory described was stated in detail],"

and the public notice closed as follows:

"NOTICE IS FURTHER GIVEN: That the hearing on said petition will be held at 8: 00 o'clock P. M., on the 12th day of July, 1948, at the Alderwood Water District office in Alderwood Manor, Snohomish County, Washington, at which time and place all owners of property included in the territory above-described may be heard on any matter pertaining to said petition."

Notice was signed by the president of the Alderwood water district, and attested by the secretary of the district. The notice was again published in the Edmonds Tribune-Review on June 24, 1948.

The meeting of the water district commissioners on July 12, 1948, was well attended. The president of the board opened the meeting by reminding those present that it was called as a hearing on the petition for the creation of LID No. 18, including the lands described in the petition and in the notice which had been published calling the hearing. He then asked Mr. Wolff, the district engineer, to explain the plan proposed to establish LID No. 18, and to answer any questions concerning it which the people in attendance might propound. Mr. Wolff, in explaining the plan, used a very comprehensive map showing the lines and the mains of the existing system and the improvements contemplated, designed for the then population of the proposed LID No. 18, plus the estimated increase during the next twenty years. The map, so used and fully explained at the meeting, is one of the exhibits in the appeal record. Mr. Wolff testified at the trial that, in his talk to the persons present at the July

12th meeting, he gave an estimated cost of the project and offered to estimate the probable amount of assessments on particular tracts included in the proposed local improvement district, and that he did make such an estimate for two landowners.

Mr. Wolff further testified that no protests were made at the meeting against the creation of LID No. 18, and H. O. Hutt, one of the commissioners of the Alderwood water district, and secretary thereof and custodian of its records, testified that no such protests were made at the meeting and that no written protests were ever received at the Alderwood district office.

Resolution No. 409, providing for the establishment of LID No. 18 and ordering the contemplated improvements thereof, was thereupon formally adopted by the commissioners at the July 12th meeting, and the district engineer was directed to proceed with the work by preparing the plans and call for bids. The call for bids was published in the Edmonds Tribune-Review on December 23, 1948, and republished on the following December 30th. The call stated that the plans and specifications for the improvement of LID No. 18 could be secured at the office of District Engineer Wolff, and also stated that the water district would require of the contractor a performance bond in the full amount of the contract. It further stated that bids would be received at the water district's office in Alderwood until eight p. m. on January 10, 1949, at which time all bids received would be publicly opened and read, and the award of the contract would be made as soon as practicable. At the time provided by the notice for the opening of the bids, bids had been received at the Alderwood water district from four contractors.

Bids were submitted, based on the installation of cement asbestos pipe. However, the bidders, on their own initiative, also submitted bids based on the use of dipped and wrapped steel pipe. Those bids were: By Argentari & Collarozi, $398,536; by Thorburn & Logozo, $409,114; by Valley

Construction Co., $396,521.03; by Malaspina & Napoli, $390,371.71.

The bid finally accepted was that of the low steel pipe bid of Malaspina & Napoli. The Alderwood water district and Malaspina & Napoli signed the contract on January 20, 1949. On the same day, Malaspina & Napoli furnished to the water district a performance bond in the full sum of the contract price, as was required in the notice to bidders. The United Pacific Insurance Company executed the bond as surety thereof.

As soon as the contract was signèd and the $390,371.71 performance bond was furnished, the Malaspina & Napoli Company, hereinafter referred to as Malaspina, entered into other contracts for pipe and other material required for the performance of the contract, and moved his company's heavy-duty machinery to the premises, including one crane, a number of trucks, two steam shovels, two trenching machines, and three or four bulldozers, and began to do the preliminary work. He also distributed large quantities of pipe along the roads in LID No. 18. Most of it was delivered and on the ground in March, 1949, and, as the trial judge stated in his memorandum decision, the actual construction commenced on March 9, 1949. No objection to the improvement was made by the plaintiffs, or the interveners who joined with them, until they filed this action about a month later (April 8, 1949). Prior to the trial of the case, which began on June 6, 1949, Malaspina, as the trial judge found, had expended, or incurred, obligations for materials and labor in the prosecution of the work to the extent of about two hundred thousand dollars.

Malaspina testified, at the trial, that, if he could cash $132,000 of the warrants, he was ready, able, and willing to complete the project in accordance with his contract. However, under the circumstances, he was compelled to stop the work. Portions of the work were already completed when this suit was filed, but some of it was in need of slight alterations and corrections, so he kept some of his men on the payroll for a few weeks after the beginning of the action. The

payroll for April 17, 1949, eight days after the institution of this action, amounted to $2,223.21. His next payroll amounted to $1,474.64, the May first payroll to $533.44, and May eighth to $314.64. The stoppage of the work caused by this litigation compelled him to disband his crew, and it cost him nine hundred to one thousand dollars to remove his heavy-duty machinery to other jobs or to his Seattle yard; and yet, the appellants are contending here that the trial judge erred in not enjoining him from completing his contract.

The trial judge's dismissal of the action was primarily based on legal grounds. However, he did say, as to the equities of the case:

"If called upon to fix a balance of equities—and counsel for defendants and the interveners joining them have been insistent—I freely say that the equities quite overwhelmingly preponderate in favor of those ones, particularly so as to the contractor which undertook the construction of the project and, though perhaps in lesser measure, in favor of those ones who have thus far financed the project."

We are also of that opinion.

As the matter stands, if we reverse the decree and reinstate the action, Malaspina, if appellants ultimately prevail, would stand to lose $132,000 he holds in water district warrants, and the intervening investment bankers would likely lose the sum paid for the first $60,000 of warrants, while the appellants would have the benefits of the money advanced by the intervener investment bankers and expended by Malaspina. Even if we affirm the decree, the appellants will have the benefits of an adequate water system, and their assessments, when made, must, under law, comport with the benefits they receive.

All the respondent interveners, in good faith, advanced their money in reliance upon an apparently valid action of qualified municipal officers. They relied upon what, on its face, appeared to be a valid petition which had been circulated throughout the district for many months. No specific protest as to its sufficiency was made during a period of years, although it was at all times available for examination.

No protest whatever was made at the well-advertised meeting on July 12, 1948, at which the resolution, No. 409, authorizing the creation of LID No. 18, was thoroughly explained and then and there adopted. Even after Malaspina moved his heavy equipment into LID No. 18 and delivered 99,000 feet of pipe on the ground, and installed 36,000 feet of it, and some of the water users were receiving water through it, there was no protest until this suit was filed. Appellants stood by and accepted the benefits of Malaspina's labor and materials until he had accepted $132,000 of uncashable warrants, and only then this action was filed.

In his memorandum decision, the trial judge stated, in part:

"The grounds upon which plaintiffs and interveners joining them seek relief, are alleged in Paragraph VIII of the complaint as follows:

" 'That the defendants never acquired any jurisdiction whatever to proceed with said improvement because of the following reasons:

" 'First: No election was ever had to approve the general comprehensive scheme and plan of betterments to Local Improvement District No. 2 as constructed.

" 'Second: That said petition did not ask that "any portion of general plan adopted be ordered" as required by statute.

" 'Third: Failure to secure a majority of the owners of property within the boundaries of Local Improvement District No. 18 to sign the said petition.

" 'Fourth: Failure of the water district commissioners to declare the cost of the proposed improvement, to declare the proportion of the cost to be borne by the general district and Local Improvement District No. 18, and the adoption by the commissioners of non-existent specifications.'

"These it will not be the attempt of this Court to deal with in the exact order, but the subject matter of every one of these objections will be sought to be ruled upon."

In his memorandum decision, the trial judge did rule upon each of plaintiff's contentions, and adversely to appellants in each instance, except their contention that the petition for the improvement did not have a sufficient number of signatures. But this he held not a jurisdictional

defect but a mere irregularity. We regret that we cannot quote the whole of his thoroughly well-considered memorandum decision which would be of great value to attorneys in future cases similar to this. However, the memorandum decision will, of course, remain in the files of this cause (No. 31202) in the office of the clerk of this court, and be readily available to future researchers in this field of law. In his memorandum decision, the trial judge began his discussion of the plaintiff's contentions, heretofore stated, by stating that the major questions of law involved required the construction of the statutes which provide for water districts and the procedure for their organization and management (Rem. Rev. Stat., §§ 11579 to 11604, inclusive), and particularly the legal construction to be put on §§ 11587 and 11590. He then quoted a portion of § 11587. In so doing, he highlighted and emphasized the importance of the opening lines of the section by writing them in capitals as follows:

"SAID WATER DISTRICT SHALL HAVE THE POWER TO ESTABLISH LOCAL IMPROVEMENT DISTRICTS WITHIN ITS TERRITORY; to levy special assessments under the mode of annual installments extending over a period not exceeding twenty years on all property specially benefited by any local improvement on the basis of special benefits to pay in whole or in part the damages or costs of any improvements ordered in such water district; to issue local improvement bonds in any such improvement district to be repaid by the collection of local improvement assessments: . . ."

As later shown herein, the clear grant of power to water districts, capitalized in the foregoing quotation, is the veritable cornerstone of the trial judge's memorandum decision. After making the foregoing citation, he resumed his memorandum decision by quoting the following portions of § 11590:

" 'Whenever a petition signed by a majority of the owners of land in the district to be therein described shall be filed with the water district commission, asking that any portion of the general plan adopted be ordered, and defining the boundaries of a local improvement district to be created to pay in whole or in part to pay the cost thereof, it shall be the duty of the water district commission to fix a date for

hearing on such petition. . . . Provided, that in the event that any portion of the system after its installation is not adequate for the purpose for which it was intended, or that for any reason changes, alterations or betterments are necessary in any portion of the system after its installation, then a local improvement district with boundaries which may include one or more existing local improvement districts may be created in the water district in the same manner as is provided herein for the creation of local improvement districts.'

"As the record will disclose, it was my own original acceptance that the filing of a petition with signatures of eligible persons in the number required by the above quotation was indispensable and a jurisdictional pre-requisite to the establishment of a local improvement district by Alderwood Water District. A careful study of the series of cases presented me on behalf of the defendants and those joining them as interveners has led me, somewhat reluctantly I admit, to a different conclusion. I reach this contrary conclusion for the reason only that I deem such to be advised by the principle as I deduce such to be declared by the highest court.

"Those cases begin with *Collins vs. Ellensburg, 68 Wash. 212.* While that case did not involve a water district, nor the establishment of a local improvement district in such, but rather the establishment of a local improvement district within a city of the third class under the statutes then applicable it remains that the reasoning of the case would seem to be here controlling. The analogy is quite complete, even to the provisions of Sec. 11,592 as to what shall be the legal consequence of the confirmation of an assessment roll so far as concerns the right of anyone to question. Nowhere was a city of the third class by any statutes therein referred to more explicitly and more clearly granted the power to form a local improvement district than is a water district by the quoted portion of Sec. 11,587 granted the power to establish local improvement districts within its territory.

"I take it that the underlying and basic legal principle to be adduced from that opinion would seem to be that where the power exists and there is no constitutional obstacle, the failure to have petition sufficient within statutory provisions is not the exercise of power by the municipality without jurisdiction and a nullity, but is rather a mere irregularity; —that failure to meet a statutory requirement is not fatal if that requirement was such as could constitutionally have been dispensed with by the legislature.

"The case has had approval and the principle therein enunciated has been reasserted without criticism or dissent in numerous cases cited, down to and including at least *Allen vs. Bellingham*, 77 *Wash.* 469. . . .

"It is true that in this instance the form of the action taken by the Board of Water Commissioners was as if the Alderwood Water District acted upon and by virtue of a petition meeting the requirements of Sec. 11,590, but it remains that if the Board of Water District Commissioners were legally endowed with the power to act without petition the form is not controlling, and that the insufficiency of the petition or the inadequacy of the number of signers of owners of land becomes an immaterial matter and need give no further concern. I may say here that I have greater reason to believe than otherwise that there was not the statutorily required number of signers, eligible signers, upon this petition."

The respondents vigorously contended that the petition for the improvement did contain the required number of signers, and call our attention to a great deal of evidence tending to so prove. However, if we accept the trial judge's construction of the statutes and his interpretation of the opinion in *Collins v. Ellensburg* and several other cases subsequently decided in this court, *supra*, it does not matter whether or not there were sufficient signers of the petition, and we will not attempt to weigh the conflicting evidence as to that matter.

The appellants, in their briefs and in their oral arguments in this court, relied partly upon *Elston v. King County*, 178 Wash. 210, 34 P. (2d) 906, and *Ruffin v. Sewell*, 134 Wash. 208, 235 Pac. 31. Apparently, appellants strongly relied on those cases at the trial also; for the trial judge, in his memorandum decision, took elaborate pains to point out that, in each of those cases, the improvement in question was made under very different statutes than those involved in this case, the *Elston* case being concerned with an improvement under the so-called "Donohue Road" law, and, in the *Ruffin* case, the improvement made under statutes providing for the establishment of drainage districts, saying:

"Thus, in both of these instances, the legislature had not vested power in an existing public or municipal corporation to create local improvement districts."

■ As we have hitherto stated, one of the contentions of the appellants was that the water district involved held no election to approve the general comprehensive scheme and plan of betterments to LID No. 2. The trial judge, in his memorandum decision, disposed of that contention by a paragraph reading as follows:

"Far from being any alteration of, or betterment of, the general comprehensive scheme of Alderwood Water District adopted by election, this project constituted the consummation of the purpose of the comprehensive scheme to furnish water to consumers and the public."

In concluding his memorandum decision, the trial judge rejected several other contentions of the plaintiffs that the Alderwood water district had no jurisdiction to create LID No. 18. The memorandum decision closed as follows:

"Finally, I am not of opinion that there was failure of the commissioners to declare the estimated cost of the project at the meeting of July 12, 1948. It is not required that such estimated cost be incorporated in express and exact words in Resolution No. 409. I accept the testimony of Mr. Wolff, the engineer, that at that meeting of July 12, 1948, he did make oral declaration of the estimated cost.

"I also accept that one's testimony that Exhibit No. '6' was exhibited at that meeting, and that from it as a plan he made explanation of the project. Such was sufficient as a general plan and the resolution as to such is sufficient.

"Also, it is that the Board of Water Commissioners did fix the proportion of cost to be borne by the Local Improvement District No. 18 and Alderwood Water District when it was declared expressly in the Resolution No. 409 that all cost should be to the Local Improvement District No. 18."

■ We are of the opinion that the memorandum decision of the trial judge was sound in every respect, and it follows that the judgment and decree based upon the decision was warranted by the evidence in the case and by our statutes pertaining to the subject matter.

The judgment and decree from which this appeal was taken will, therefore, stand affirmed. It is so ordered.

SIMPSON, C. J., MALLERY, HILL, and HAMLEY, JJ., concur.